Elizabeth A. SMITH et al., Plaintiffs,

v.

**CITY OF EAST CLEVELAND et al.,**
Defendants.

No. C 73-299.

United States District Court,
N. D. Ohio, E. D.

Sept. 6, 1973.

Rita Page Reuss, Jane M. Picker, Cleveland, for defendants.

Henry B. Fischer, Director of Law, Paul Mancino, City of East Cleveland, Cleveland, for plaintiffs.

## MEMORANDUM OPINION AND ORDER·

LAMBROS, District Judge.

Plaintiffs claim that practices and restrictions of defendant municipal officials in hiring police· officers in East Cleveland, Ohio, deny blacks and women their rights to equal protection under the law in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution.

Plaintiff represents both a class of all women who have been denied the opportunity to apply for employment as an

East Cleveland police officer because they are under 5 feet 8 inches or 150 pounds and a class of all black applicants who took the East Cleveland examination for police officer and were denied employment because their scores were too low. In particular, plaintiffs claimed at trial the following violations of the Equal Protection Clause of the Fourteenth Amendment:

1. Defendants' enforcement of an ordinance requiring applicants for police officer to be a minimum of 5 feet 8 inches in height and a regulation requiring applicants to weigh a minimum of 150 pounds unlawfully discriminates against female applicants.

2. The written Army General Classification Test which is administered by defendants as a part of the hiring process for police officer unlawfully discriminates against black and female applicants.

3. The preference given to applicants who are veterans is applied by defendants prior to determining whether a candidate is qualified to be a police officer in violation of Ohio Rev.Code § 143.16. This method of applying the preference results in unlawful discrimination against female applicants.

For each of these claims plaintiffs seek declaratory and injunctive relief, costs, and attorney fees.

## I. BACKGROUND OF THIS DISPUTE

The Police Department in the City of East Cleveland, a suburb of Cleveland, has an authorized strength of 71 officers, of whom 51 are patrolmen, 11 are detectives, and the remainder are administrative personnel. The City population of 39,600 is presently about 60 per cent black and 55 per cent female. Nine persons or about 12 per cent of the officers are now black. There are no female police officers.

Historically, the composition of the Police Department and population has remained fairly constant with respect to sex but has varied somewhat with respect to race. The proportion of women in the population has historically been about 55 per cent, but the City has never certified for hiring or hired a woman as a police officer. The proportion of blacks in the City increased from 10 per cent in 1965 to the present 60 per cent. Prior to 1967 the Police Department had no black officers. From 1967 to the filing of this suit the City hired 24 officers, of whom 8 persons or one third were black. During this time, about one third to one half of the applicants were black.[1]

Defendants, pursuant to ordinances, regulations and policies, accept applications only from those persons who are over 5 feet 8 inches and 150 pounds. The qualifying process for those whose applications are accepted generally includes a written examination (the Army General Classification Test), an athletic test, a medical examination, and an oral interview. These items are scored as will be further discussed below and are adjusted by a credit if the applicant is a veteran. The Civil Service Commission then certifies those applicants receiving the highest scores to the City Manager, who must hire one of the top three certified for each position.

The named plaintiff, a black woman who is 5 feet 5 inches and weighs 136 pounds, received notice that East Cleveland would be accepting applications for police officer from her classmate in law enforcement at Cuyahoga Community College. When she inquired about the position of police officer she was originally discouraged by a receptionist of the Civil Service Commission. After applying she was told by the receptionist that she could not take the examination because she did not meet the minimum height and weight requirements. She

1. There is no way to ascertain how many women would have applied but for the height and weight requirements written on the flyer accompanying the application forms. One woman did meet the height and weight requirements and took the examination. She did not score high enough on the written examination to be certified.

then filed this suit and took the examination pursuant to a temporary restraining order issued by Judge William K. Thomas. Upon completion of the examination defendants reported that plaintiff had scored 102.1 and that, because the "cut-off" score for the eligibility list was 146, plaintiff was not placed on the certified list of eligible police candidates. Defendants maintain that plaintiff may be prohibited from taking subsequent examinations because she does not meet the height and weight requirements.

## II. DEFENDANTS' MOTION TO DISMISS

Defendants have moved to dismiss certain named defendants on the grounds of legislative immunity, failure to state a claim against certain defendants and inapplicability of the term "person" as used in § 1983 to the City. In addition, defendants have moved to dismiss the entire suit on the grounds that the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, is the exclusive remedy for employment discrimination and that this suit is barred for a failure to exhaust remedies available before the Equal Employment Opportunity Commission, as is required under that statute. The Court deferred ruling on these motions until after trial.[2]

 Defendants correctly argue that this Court has no jurisdiction over defendant City of East Cleveland under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) under the holding in City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), that a municipal corporation is not a "person" for purposes of § 1983. The Court in City of Kenosha, however, reserved the question of jurisdiction under the general federal question statute, 28 U.S.C. § 1331, over claims brought under the Fourteenth Amendment. City of Kenosha, supra, 93 S.Ct. 2222, 37 L.Ed.2d at 117. In Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court permitted a litigant to raise a Fourth Amendment claim in federal court under 28 U.S.C. § 1331 but did not discuss whether a Fourteenth Amendment claim would also pose a federal question. Because there has been insufficient argument on this point, the Court is hesitant to rule that a litigant may obtain relief for a violation of the Fourteenth Amendment by a state or subdivision thereof which denies "to any person within its jurisdiction the equal protection of the laws" under the jurisdiction conferred by 28 U.S.C. § 1331 alone. See generally Bivens, supra, 403 U.S. at 398, 91 S.Ct. 1999 (J. Harlan's concurring opinion). Furthermore, in this case the plaintiffs have not provided evidence sufficient to determine whether the amount in controversy as to each member of the class meets the $10,000 jurisdictional minimum required under § 1331. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969) (regarding jurisdiction under 28 U.S.C. § 1332); Russo v. Kirby, 453 F.2d 548, 551 (2d Cir. 1971) (applying to jurisdiction under 28 U.S.C. § 1331). Therefore, the Court will dismiss the claims against the City of East Cleveland without prejudice to their reinstatement if plaintiffs show a basis for jurisdiction within twenty days of the date of this Order.

 Because plaintiffs have failed to show any non-legislative function performed by the City Commissioners or any acts by the City Manager which have denied plaintiffs equal protection of the laws, the Court must also dismiss these parties defendant from the suit. It does, however, find that the Police Chief's functions in defining the duties and required skills for the police officer and the Civil Service Commissions' acts in promulgating requirements for certifying applicants are properly before this Court and that the Police Chief and Civ-

---

2. Defendants also moved to dismiss plaintiffs' claims against the Law Enforcement Assistance Administration. In a pre-trial ruling the Court severed these claims for purposes of trial and deferred ruling on them.

il Service Commission should not be dismissed.

Finally, the Court finds defendants' argument that the Civil Rights Act of 1964 as amended in 1972 is the sole remedy for employment discrimination to be without merit. The following cases, many of which were against public employers and were brought after the 1972 amendment to the Civil Rights Act of 1964, reject the argument that the provisions of 42 U.S.C. § 2000e provide an exclusive remedy for employment discrimination, particularly in a case such as this in which a preliminary injunction is required immediately to prevent irreparable damage. Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); The Shield Club v. City of Cleveland, 5 [CCH] EPD ¶ 7027 (N.D.Ohio 1972) (J. Thomas); Harper v. Mayor & City Council, 359 F.Supp. 1187 (D.Md.1973); Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, 354 F.Supp. 778 (D.Conn.1973), aff'd in part 482 F.2d 1333 (2d Cir. 1973); Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476 (7th Cir.1970), cert. denied, International Harvester Co. v. Waters, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972); O'Brien v. Shimp, 356 F.Supp. 1259, 1263–1265 (N.D.Ill. 1973).

## III. HEIGHT AND WEIGHT REQUIREMENTS

Applicants for police officer in East Cleveland must be between 5 feet 8 inches and 6 feet 6 inches in height and must be between 150 and 235 pounds in weight. The height requirement is imposed by ordinance which provides:

> To be eligible for appointment as patrolman or fireman, the applicant must be at least five feet, eight inches in height, but not over six feet, six inches. Ch. 123.07(d), Codified Ordinances of the City of East Cleveland.

The ordinance was passed in 1964. However, prior thereto a height requirement was imposed by practice of the Civil Service Commission.

The weight requirement has been established by the City pursuant to the medical fitness requirement in Ch. 123.-07(c) of the Codified Ordinances of the City of East Cleveland and is stated in the flyer given to potential applicants. The minimums and maximums are established for each height between 5 feet 8 inches and 6 feet 6 inches. The minimum for the entire group is 150 pounds and the maximum 235 pounds.[3]

### A. *Discriminatory Intent and Effect of Requirements*

The effect of the height and weight requirements together is to exclude 99 per cent of the adult female population in the community from employment as police officers. Separately, the height requirement excludes 95 per cent of the adult female population and the weight requirement excludes between 78 and 84 per cent of the adult female population. In contrast to this almost total exclusion of women, the requirements permit the majority of the adult male population to be eligible for such employment. The height requirement excludes only 46 per cent of the adult male population and the weight requirement excludes only 28 per cent of the adult male population.[4]

---

3. The approved weights in pounds are as follows:

| | |
|---|---|
| 5′ 8″ | 150–181 |
| 5′ 9″ | 150–186 |
| 5′ 10″ | 152–192 |
| 5′ 11″ | 154–197 |
| 6′ | 156–203 |
| 6′ 1″ | 158–209 |
| 6′ 2″ | 160–214 |
| 6′ 3″ | 162–219 |
| 6′ 4″ | 164–225 |
| 6′ 5″ | 166–230 |
| 6′ 6″ | 168–235 |

4. The exact percentages vary slightly depending on the age group chosen. However,

■ The height and weight requirements must be examined in the context of the prevailing policy toward hiring women. Jay Price, president of the East Cleveland Civil Service Commission from 1951 to 1971, stated that there were no positions open for women in the 1950's when the height and weight requirements were maintained as Civil Service practices. He further explained that the requirements represented a figure which was considered reasonable for male applicants and that, had the Commission been seeking women, it would have modified the requirements accordingly. The fact that the Civil Service Commission did not want to hire women is verified by the testimony of plaintiff and another woman applicant that the receptionist answering the phone at the Civil Service Commission attempted to discourage their applications, stating that the Police Department was not seeking women. It is also significant that two males under 5 feet 8 inches were permitted to take the 1973 examination. During the entire history of the Police Department no women have either been certified for hiring or hired as police officers and only one has been voluntarily permitted to take the examination. All these factors are relevant in determining whether the height and weight requirements discriminate on the basis of sex. See generally Harper v. Mayor & City Council, 359 F.Supp. 1187 (D.Md.1973).

The background that the requirements related to a male-only policy and their exclusionary effect, considered together, lead the Court to the conclusion that the height and weight requirements are discriminatory on the basis of sex. Moreover, the effect of the requirement on men and women is so highly disparate that the effect alone is sufficient to require a review of the restrictions as classifications based upon sex.

■ The practice of permitting consequences of restrictions and not merely motivation to be used as proof of discrimination was sanctioned under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Three circuits have also ruled under the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983, that a requirement producing a largely disparate effect on a given group would be constitutionally impermissible if the requirement were not rationally related to job performance. Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1972); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) (en banc), cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Commonwealth of Pennsylvania v. O'Neill, 348 F.Supp. 1084 (E.D.Pa.1972), aff'd in part, rev'd in part 473 F.2d 1029 (3d Cir. 1973) (en banc); Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, 354 F.Supp. 778 (D.Conn. 1973), aff'd 482 F.2d 1333 (2d Cir.1973); Shield Club v. City of Cleveland, 5 [CCH] EPD ¶ 7027 (N.D.Ohio 1972); Western Addition Community Organization v. Alioto, 330 F.Supp. 536 (N.D. Cal.1971), 340 F.Supp. 1351 (N.D.Cal. 1972); Fowler v. Schwarzwalder, 348 F.Supp. 844 (D.Minn.1972), 351 F.Supp. 721 (1972). In none of these cases was the disparate effect of the hiring requirement involved as great as that of the height and weight requirements in this case.[5] Although the Court is aware

the differential between males and females remains fairly constant.

5. In *Bridgeport Guardians, Inc., supra,* 58 per cent of the whites taking the examination received a passing score while only 17 per cent of the minority groups received a passing score. In *The Shield Club, supra,* 95.5 per cent of the whites taking the examination received a passing score while only

73.7 per cent of the blacks received a passing score. In *Castro, supra,* 65 per cent of the whites taking the examination used received a passing score while only 25 per cent of the blacks and 10 per cent of the Spanish surnamed persons received a passing score. In *Chance, supra,* white candidates passed supervisory examinations at almost 1½ times the rate of black and Puerto Rican candidates. In *Carter, supra,* blacks constituted

that the cases cited related to discrimination based on race or national origin, it believes the method of proving discrimination is equally applicable to women.

▮▮▮▮ Based on the evidence of intent and effect or, alternatively, effect alone, the Court concludes that the height and weight requirements in this case discriminate on the basis of sex. The question of whether this discrimination is lawful depends on whether the height and weight requirements are rationally related to a valid state interest. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). In this case, the question is whether the height and weight requirements are rationally related to job performance for an East Cleveland Police Officer.

### B. Justifications for Requirements— Legal Theory

The Supreme Court's holdings regarding review of classifications based on sex in Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), represent a significant departure from the review given similar classifications in earlier years.

In its earlier holdings, the Supreme Court upheld restrictions against women under the Equal Protection Clause if there was any conceivable justification for the classification which was related to a valid state interest. In reviewing the justifications given, the Court did not require that the state provide any facts to support its view but expressed a willingness to accept any generalization based upon a stereotype of women. See generally Brown, Emerson, Falk, Freedman, "The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women," 80 Yale L.J.

872, 875–882 (1971). For example, in Bradwell v. Illinois, 83 U.S. 130, 21 L. Ed. 442 (1872), the Supreme Court upheld legislation prohibiting women from admission to the bar. Justice Bradley reasoned that such a restriction was justified because "the natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life." 83 U.S. at 141, 21 L.Ed. 442 (J. Bradley, concurring). In 1948 the Supreme Court upheld a statute prohibiting women from being licensed as bartenders unless they were a wife or daughter of a male owner, asserting:

> The Constitution does not require legislatures to reflect sociological insight, or shifting social standards, any more than it requires them to keep abreast of the latest scientific standards. Goesaert v. Cleary, 335 U.S. 464, 465– 466, 69 S.Ct. 198, 199, 93 L.Ed. 163 (1948).

As late as 1961 the Supreme Court upheld a statute prohibiting women from jury duty unless the women volunteered, rationalizing that a woman's place was in the home. Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961).

The Supreme Court's earlier holdings demonstrates the result of accepting the state's rationalizations without further review of the basis for them. In Frontiero, Justice Brennan, speaking for four members of the Court, mentioned these earlier holdings and noted:

> There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination. Traditionally, such discrimination was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women not on a pedestal, but in a cage. . . . As a result of notions such as these, our statute books gradually became laden with gross, stereo-

---

6.4 per cent of the population but less than 1 per cent of the fire department. In *O'Neill, supra,* 65 per cent of the whites taking the examination received a passing score while only 35 per cent of the blacks received a passing score. In *Alioto, supra,* 37 per

cent of the whites taking the examination received a passing score while only 12 per cent of the blacks received a passing score. In *Fowler, supra,* minorities constituted 6 per cent of the population but only 1 per cent of the fire department.

typical distinctions between the sexes. 93 S.Ct. at 1769.

In both *Reed* and *Frontiero,* the Court refused to accept the "gross, stereotype generalizations" which would have been sufficient to uphold the restrictions under earlier Supreme Court rulings. In *Reed,* the Court ruled invalid a statute which gave men preference for appointment as administrators of estates and rejected the justification that men would be more often qualified because of their involvement in politics, the professions, business or industry. *Reed,* 404 U.S. at 77, 92 S.Ct. 251. In *Frontiero,* the Court held invalid a statute which permitted a presumption of dependency in the case of a serviceman's family but not in the case of a servicewoman's family, and eight justices rejected the justification that the man is more often the breadwinner as sufficient reason to disqualify all women automatically.[6] The lower courts reviewing restrictions against women have interpreted the recent cases as representing, first, a willingness to review those stereotype rationalizations for classifications to determine whether they rest on some ground which has a demonstrably fair and substantial relation to the object of the legislation and, second, a willingness to reject administrative cost as a proper justification for permitting restrictions against women in employment. Aiello v. Hansen, 359 F.Supp. 792 (N.D.Cal., 1973); Gunther, "Forward: In Search of Evolving Doctrine in a Changing Court: A Model for a Newer Equal Protection," 86 Harv.L.Rev. 1, 20, 27–33 (1972); LaFleur v. Cleveland Board of Education, 465 F.2d 1184 (6th Cir. 1972), cert. granted, 411 U.S. 947, 83 S. Ct. 1921, 36 L.Ed.2d 408 (1973);[7] Brenden v. Independent School District 724, 477 F.2d 1292, 1296 (8th Cir. 1973).

 Applying the *Frontiero* standard of review to this case, the Court rejects as an adequate justification the unsupported generalization that large male policemen will perform better than short or female policemen. The Court holds that to sustain requirements which exclude nearly all women from employment as police officers, the 5 feet 8 inch and 150 pound minimums must be demonstrably related to job performance.

### C. Justifications for Requirements —Facts of this Case

In order to decide whether the height and weight requirements are related to job performance for the officer, the Court must examine the functions of the officers and the skills required to perform those functions. In making the determination, the Court received fifteen days of evidence for the entire case, including testimony and depositions from seven expert witnesses on the height and weight requirements alone. The Court considered the functions performed by all officers, since due to a small department the patrolmen are rotated between various duties and since it is reasonable to hire patrolmen capable of promotion

---

6. Four justices stated that classifications based upon sex were subject to the close scrutiny test previously reserved for race and national origin. It is unclear whether a fifth member of the Court, Justice Stewart, joined in this position, thereby making it a majority position. Because the Court finds the height and weight requirements are invalid under the rational relationship test applied by Justice Powell in his concurring opinion, it does not reach the question of whether the close scrutiny standard applies to classifications based upon sex.

7. The Court is unable to reconcile the *La-Fleur* ruling (that requiring pregnant teach-ers to take a 5 month pre-delivery and 3 month post-delivery leave was unconstitutionally discriminatory) with the ruling in Robinson v. Board of Regents of Eastern Kentucky University, 475 F.2d 707 (6th Cir. 1973) (that women could be forced to observe certain curfews while men would not be under a similar restriction) on the basis of the opinions. It is not apparent whether the trial court in *Robinson* received evidence on the safety justification prior to upholding the regulation. If it did not receive such evidence, then the Court concludes that the decision in *Robinson* has been overruled by implication in *Frontiero.*

to administrative and other roles in the Department.

In order to aid the Civil Service Commission in testing and certifying applicants for police officer, the Police Department provided the following list of duties of the officer:

*Summary of Duties:* Under supervision of Police Department officers, performs general duty police work in the protection of life and property. Enforces laws and ordinances, does work in the area of crime prevention and crime repression. Is involved in regulation of non-criminal conduct, provides certain services to the community and protects individual freedom of citizens.

At trial, defendants introduced evidence that the following relevant functions were also in some instances performed by officers: effecting arrests, stopping fights, controlling crowds, carrying persons on stretchers from burning buildings, and pulling accident victims from automobiles.

Plaintiffs conceded that these functions were police functions. They presented evidence, however, that those functions claimed to be related to height and weight actually took only a small portion of the average patrolman's time and that, in fact, traffic-related matters accounted for more than three-quarters of the patrolman's working time. On the other hand, since defendants claim that the felony-related functions often resulted in physical injury to officers, the Court must examine them to determine whether they are significant functions for the police officer.

With respect to these functions, certain skills are necessary or desirable. For purposes of the Civil Service Commission, the relevant skills were described by the Police Department as follows:

*Required Knowledge and Skills:* Must be above average in social and general intelligence; ability to understand and carry out complex oral and written instructions; knowledge of first aid methods; reliable judgment; ability to drive automobile; some skill in the use of firearms; good powers of observation and memory; excellent moral character; physical strength and agility; excellent physical condition.

At trial, defendants contended that the following relevant qualifications were required in order to perform the duties: physical strength, physical fitness, physical agility, ability to view crowds, ability to drive a car, long reach with the arms, ability to absorb blows, and ability to impress others with physical prowess.

The complex factual problem is to define these broadly labeled skills in relation to the functions performed by the police officer and then to determine whether these narrowly defined skills are related to a requirement that officers be at least 5 feet 8 inches and 150 pounds. In order to make this determination, the Court will separately examine each of the specific skills listed above as they relate to functions performed by East Cleveland police officers.

1. *Physical Strength.*

Since strength is the ability to produce a desired effect, it is impossible to determine whether the needed strength exists until the desired effect is defined. In the case of a police officer in East Cleveland, the desired effects include restraint of a hostile and struggling person during an arrest or flight, harm to that person in certain instances when restraint is ineffective, carrying persons on stretchers, and pulling persons from wrecked automobiles. Professor Lawrence Golding, an expert in applied physiology who has worked with police departments, testified that these tasks would in most instances require what he referred to as "leverage strength," or the ability to use the body mass at a particular angle in order to lift or to direct the body. In a few instances, the officer who was restraining or fighting could conceivably use what might be characterized as "brute force" or the

strength which results from mass alone, such as sitting on a person or hurling his body at someone. These forms of strength will be discussed in more detail below.

The "leverage strengths" such as lifting an accident victim, carrying a stretcher, or twisting an arm to restrain a victim have very little relationship to height and weight but are more directly related to training on the ways to use the body and to fitness and conditioning the muscles. Where a relationship does exist between height and "leverage strengths," it is a negative relationship. In other words, all things being equal, a very tall person would have a disadvantage because the leverage angle would be less efficient in such activities as lifting. To illustrate this, Professor Golding pointed out that Olympic weight lifters tend to be an average of 5 feet 4 inches.

On the other hand, "brute force" would be directly related to the weight of the person, so that a 200-pound person would exert more force by throwing his or her body against another than could a 100-pound person. To the extent that a larger person could usually weigh more than a shorter person and still remain physically fit, there is some relationship between the ability to exert "brute force" and the height of the individual.

However, since the use of "brute force" in restraining or defending would be more likely to result in injury to the officer and the person restrained than the methods of arm twisting, finger twisting, and applying pressure, the officers are trained and advised to use the "leverage" methods as preferred methods. Thus, in a modern police force, the ability to use "brute force" is not a necessary skill to perform job functions.

In summary, therefore, there is no positive relationship between "leverage strength" needed to perform police tasks and an individual's height and weight.

Furthermore, there is a tenuous positive relationship between "brute force" and height and a positive relationship between "brute force" and weight, but there is very little need for the use of such force by a modern police officer.

2. *Physical Fitness.*

Physical fitness includes both stamina (cardiovascular efficiency) and the proper balance of body muscle and body fat. There is no doubt that some level of physical fitness is related to job performance. Physical fitness is unrelated to height. Therefore, the question is whether it is related to the minimum weight requirement, which is set forth in Footnote 3 above.

Professor Golding testified that a physically fit person should have a proper level of muscle and of body fat. In his opinion, while, in the extreme, obese or underweight conditions would indicate that a person did not have the proper allocation of body fat and muscle, the exact weights listed on the table in Footnote 3 are not indicia of fitness (although they would represent average weights for fit persons).

He suggested that it is a common practice in some police departments and schools to measure the percentage of body fat through a formula. The person's fat layer is measured in three points in the body. When these measurements are inserted into a formula, an accurate measure of body fat results. Therefore, there would be no reason for utilizing a minimum weight to measure body fat and therefore fitness, except perhaps a five minute timesavings in testing.[8] For this reason, the requirement of a 150-pound minimum weight is not related to physical fitness as required for the police officer.

3. *Physical Agility.*

In performing many of the functions described above, the police officer must react quickly. Although agility may re-

---

8. Administrative cost savings does not justify the maintenance of a requirement which ex-

cludes on the basis of sex. *Reed, supra;* *Frontiero, supra.*

late to many skills, the only conceivable relationship between agility requirement and height or weight for the police officer is with respect to running after a suspect. However, Professor Golding testified that the height requirement would relate to such speed only in the case of long-range running, while the agility required for the police officer's job performance is only short-range running. He further testified that there was no relationship between the minimum weight requirement and agility. His expert testimony was uncontradicted in these respects.

#### 4. Ability to View Crowds.

Police patrolmen are at times required to patrol in crowds such as at athletic events. They also retain the readiness to patrol at riots, should a riot develop. The Police Chief testified that, since the average person is about 5 feet 8 inches in height, a police officer should, if possible, be taller than the average person so that he may see and be seen in crowds.

His conclusion is, however, based upon two erroneous assumptions. He assumes, first, that the crowd is a uniform 5 feet 8 inches, so that a person taller than the average could see and be seen in crowds. However, about 15 per cent of all persons between 18 and 79 years of age are over 5 feet 10 inches in height. About 5 per cent of that group are more than 6 feet in height. Therefore, when one speaks of having a height above the crowd, one must refer to someone well over the average height. Second, he assumes that, as far as viewing the crowd or being viewed is concerned, the officers or crowd participants' eyes will be located at the top of the head. Since this is usually not the case, one must add an additional several inches to the height required to see or be seen in the crowd. Thus, a 5 feet 8 inch height requirement obviously has no logical relationship to either viewing crowds or being viewed by them.

#### 5. Ability to Drive Car.

Since the uncontradicted expert testimony of Dr. Stoudt of Harvard University was that cars were designed to accommodate 90 per cent of the population without modification and since this would include everyone over 5 feet in height, a 5 feet 8 inch height requirement could have no relationship to the requirement that police officers must be able to drive cars.

#### 6. Arm Reach.

The expert testimony established that the length of the arms is directly related to height. Therefore, the question is whether the length of the arm is related significantly to job performance of the police officer.

Defendants argue that in the situation of a person resisting arrest, when twisting arms and other restraining methods fail, there might be an occasion when a fist fight would ensue in which the person who had the advantage as to reach could conceivably hit the other person while standing far enough away to avoid blows from the other person. Defendants were unable to show that this situation was one which occurred with any degree of frequency.

Plaintiffs' expert, an instructor in self-defense techniques at Case Western Reserve University and in restraining techniques taught to several police departments, testified that with respect to either restraining or self-defense techniques, arm length was not a significant factor. (The officers are also taught some aspects of juijitsu and the use of the night stick to restrain without necessarily harming the resisting person.) For example, with respect to juijitsu tournaments, there are no height and weight classifications. In fact, the expert witness, who was herself 5 feet 2 inches, was often matched in tournaments against persons six feet and above. The evidence of the juijitsu tournaments is helpful in pointing out the minor role which arm length would

have in all other aspects of physically subduing a resisting person.[9]

### 7. *Ability to Absorb Blows.*

Defendants argued, without expert testimony, that a person over 5 feet 8 inches and over 150 pounds could more adequately absorb blows received while restraining a resisting person. No substantive evidence supports this argument.

### 8. *Ability to Impress Others with Physical Prowess and Other "Unmeasurable" Advantages of Height.*

Those testifying for the Police Department and Civil Service Commission were apparently most concerned with what they considered to be the psychological impact of having all their officers over 5 feet 8 inches. They theorized that, if the officer was taller than the person he was controlling or arresting, the shorter person would be deterred from assaulting the officer by the officer's apparent physical superiority. They claimed that their experience demonstrated that taller officers were less often attacked and, when attacked, less often and less severely injured than shorter officers. Thus, they contended, if those shorter officers among persons in the 5 feet 8 inch to 6 feet 6 inch range were more often and most successfully attacked, it would be logical to assume that those under 5 feet 8 inches would be attacked even more often and injured even more severely.

However, the facts supplied by defendants regarding assaults and injury records do not substantiate the arguments regarding the effect of height among those already employed. Of the 30 reported assaults of East Cleveland Police officers from 1969 through 1972, more than half involved situations in which the assailant was shorter than the police officer. Therefore, in more than half of the situations, the height differ-

ential did not deter an attack on the officer. The weight differential evidence is inconclusive since weights of the officers and attackers were available only in a few instances.

The figures regarding the heights of those officers assaulted relative to the rest of the Department do not substantiate the argument that shorter officers are assaulted more often. From 1969 through 1971, the median height of the officers was apparently about 5 feet 11 inches. During that period 6 of the officers assaulted were under 5 feet 11 inches, 6 of the officers assaulted were 5 feet 11 inches, and 8 of the officers assaulted were over 5 feet 11 inches. At the end of 1972, the median height was 6 feet (because 7 of the 9 officers hired during 1972 were 6 feet and over). Of the officers assaulted during 1972, 7 officers were under 6 feet and 3 were over 6 feet. When the assaults for the entire period of 1969 through 1972 are totalled, the issue of whether shorter officers were assaulted more often depends on whether the median height for the first years is used or whether the median height as it existed at the end of 1972 is used. In any case, the figures supplied as to assaults do not substantiate the argument that shorter officers were assaulted more often.

Defendants also total the days taken off for injury incurred during an arrest from 1969 through 1972 by officers under 6 feet and compare this total with a similar total for officers over 6 feet. However, this comparison provides no real measure of the relationship between height and injury. Of the 117 days taken off as the result of such injuries, 101 were taken off by 3 men as the result of 3 injuries. Two of the three men were shot and one was injured in the eye by a mental patient—obviously not injuries related to height or weight disadvantage. Thus, these figures provide no assistance to the Court in determining the

---

9. Plaintiffs proffered a demonstration regarding restraining and self-defense techniques. The Court permitted the demon-stration but now rules that it is inadmissible as substantive evidence.

general effect of height regarding injury.

### D. Conclusion

 The height and accompanying weight requirement were maintained and enforced by defendants as a part of a process to hire only males as police officers and with the effect and intent to exclude nearly all women applicants. The Court is unable to find rational support for the height and weight requirements and concludes that the requirements are based solely on the stereotype of the large male police officer.

The expert testimony from other parts of the nation leads the Court to believe that the failure of defendants to provide a rational explanation for the height and weight requirements is not unusual. Terry Eisenberg, an industrial psychologist employed by the International Association of Chiefs of Police, Inc., stated that as a result of substantial inquiry, he had found no support for a relationship between height and police work. Carl K. Wettengel, Director of Personnel for the State of Wisconsin, and his subordinate, Richard Brainerd, stated that in his opinion, based on inquiry and study of height requirements in 34 city police departments, there was no rational support for a relationship between height and police work.

It is significant that the Court has been unable to find any agency or authority which has reviewed the relationship between the height and weight requirement and police work on the basis of facts and which has arrived at a contrary conclusion. The Law Enforcement Assistance Administration refuses to permit departments receiving its funds to retain height requirements unless they first show through supportive factual data such as professionally validated studies that the requirement is an "operational necessity" for designated job categories. 38 Fed.Reg. 4553, G. 5 (March 8, 1973). The Administration's Guidelines provide in part:

The use of minimum height requirements, which disqualifies disportionately women and persons of certain national origins and races . . . will be considered violative to this Department's regulations prohibiting employment discrimination. Id. G. 4.

The Iowa Civil Rights Commission after a finding that the height and weight requirements for the Des Moines Police Department had a disparate effect against women and had no rational basis, ordered the Police Department to cease using it "until such time as they are properly able to validate in a professional manner such requirements for job-relatedness." Nancy L. Moore v. City of Des Moines Police Department, CP #881, Iowa Civil Rights Commission (July 11, 1973). The Pennsylvania Attorney General ordered a 5 feet 6 inch requirement for state police suspended until it could be demonstrated as related to job performance because it excluded women and some minority groups. [CCH] EPD ¶ 5177 (1973).

The Court therefore finds that the height and weight requirements arbitrarily discriminate against women in restricting them from employment as police officers in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment.

### IV. WRITTEN EXAMINATION

The written examination, the Army General Classification Test (AGCT), is a major factor in the rating of applicants for certification. In particular, the AGCT score is added to the physical fitness and weighted as a possible 60 points out of a possible 130 points. Plaintiffs claim that the examination is discriminatory against black and female applicants and that the examination is not related to job performance under the standards set by law.

The AGCT has been administered by the Civil Service Commission as part of the qualifying process for police officers since 1957, with the exception of 1972

when a different examination was administered. It was developed for Army use to classify enlisted personnel during World War II. In 1947 it was released for civilian use as a general aptitude test and it has not been modified since that date. The 150 questions on the examination are divided into 50 questions each on spatial relations, vocabulary, and mathematical reasoning. The test is administered as a timed examination with a calculation for wrong answers designed to penalize guessing.

### A. *Race Discrimination Claim.*

#### 1. *Prima Facie Showing.*

 The overwhelming majority of courts faced with claims of racial discrimination in employment under 42 U.S.C. § 1983 have ruled that plaintiffs may make a prima facie showing of discrimination without actual proof that the defendants were motivated by racial prejudice in their choice and use of the examination. Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1971) (en banc); Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1971); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Bridgeport Guardians, Inc., *supra;* Harper v. Mayor & City Council, 359 F.Supp. 1187 (D. Md.1973); *The Shield Club, supra.* See also cases cited in Footnote 5, supra. The Court may consider the fact that defendants have continued using an examination with the knowledge that it has a highly disparate effect on minority groups as sufficient to create a prima facie showing of discrimination which may be rebutted only by a showing that the examination is rationally related to job performance. In this case, therefore, it is relevant to inquire into both the impact and the evidence of disparate impact which was available to the defendants in choosing the test. The Civil Service Commission had available to it both the Technical Manual on the AGCT, provided by Science Research Associates, and the results of examinations in previous years.

The Technical Manual indicates that the AGCT was originally normalized only on adult white enlisted men. Later studies attempting to normalize the AGCT with respect to blacks indicated that the blacks scored lower than whites in the given groups tested. Science Research Associates, Inc., Technical Report for the First Civilian Edition of the Army General Classification Test 29. The Technical Manual warns:

> Since the AGCT quantitative and verbal parts have items that are informational in type, and since speed is a factor, it may be expected that scores for those items would be somewhat depressed for culturally deprived groups. Id.

The examination clearly had a disparate effect on blacks taking the examination in East Cleveland. The Court was provided with statistics from the administration of the AGCT in 1969, 1970, and 1973, to 101, 97, and 103 applicants respectively. In each case a third or more of the applicants were black (33 per cent of the applicants in 1969, 44 per cent in 1970 and 39 per cent in 1973 were black). The calculations regarding the comparison of black and white applicants who received a raw AGCT score of over 100, listed in the table below, demonstrate the highly disparate effect:

PERCENTAGE OF RACIAL GROUP RECEIVING RAW AGCT SCORE OVER 100 [10]

| | Blacks | White |
|---|---|---|
| 1969 | 15 per cent | 41 per cent |
| 1970 | 9 | 63 |
| 1973 | 22 | 71 |

In 1973 the average raw AGCT score for black applicants was 83.2 while the average raw AGCT score for white applicants was 106.4. Both plaintiffs' and

---

10. There is no "passing score" on the examination. However, in the past most of those placed on the certified list had a raw AGCT score of 100 or better on the examination. Therefore, 100 has been chosen for purposes of this comparison.

defendants' experts agreed that the disparate effect of the AGCT on the basis of race was highly significant and that the likelihood of the difference in scores occurring by chance alone was minimal.

In addition to the evidence concerning the effect of the examination, the Commission was aware as late as 1973 that the population of East Cleveland was 60 per cent black while only 12 per cent of the officers were black.

When the facts available to the Commission are compared with those found to be disparate enough to warrant a prima facie finding of discrimination in other public employment cases under 42 U.S.C. § 1983, it is clear that they are sufficient to warrant a prima facie showing of discrimination. See cases cited in Footnote 5, *supra.*

Defendants rest their contention that there has been no prima facie showing on three arguments. First, they argue that a third of those hired since 1968 have been black, which is not substantially lower than the percentages (about 33 to 44 per cent) of the applicants who have been black, and that there has therefore been no discrimination. However, the explanation for the high numbers of blacks hired is that 75 per cent of the black applicants were veterans and were therefore entitled to a 20 per cent veterans' preference while only 36 per cent of the white applicants were veterans. Since defendants admit that military experience is related to job performance, these statistics would indicate that in one aspect blacks were more often better qualified than whites. The fact that some blacks were better qualified in one aspect does not justify defendants in unfairly penalizing blacks on the examination if it is not also job related. Therefore, this argument does not dispel the prima facie finding made by the Court.

Second, defendants argue that the disparate effect on the examination results from the fact that 63 per cent of the white applicants had some college experience (had taken at least one college course), while only 35 per cent of the black applicants had some college experience. A similar argument was made by defendants in Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, *supra,* where the educational background of the white applicants was also arguably superior to that of the minority applicants. In rejecting the argument, the Court was apparently influenced by the desire not to permit past discrimination in educational opportunities to exclude minority applicants where that education was not related to job qualifications. Judge Newman pointed out:

> More fundamentally, this data fails to remove the prima facie showing of discrimination because it does not alter but only tries to explain the difference in passing rates. Even if defendants' evidence could establish that this difference is due in large part to the quality of schooling, a prima facie showing of discrimination would nonetheless remain if a test is used that significantly separates the applicants by any factor, including poor quality of schooling, and race or ethnic origin correlate highly with this factor. See Castro v. Beecher, *supra;* cf. Beal v. Lindsay, 468 F.2d 287 (2d Cir. 1972). Of course this does not mean that a test cannot be used whenever those with poor schooling score less well than those with good schooling. But if members of a minority group score significantly less well than others, then even if this result stems from the poor schooling many of them received, the burden shifts to the employer to provide some adequate justification for use of the test. It may well be that good schooling provides attributes needed for job performance; if so, it should not be difficult to demonstrate the validity of the test. Id., 354 F.Supp. 785. See also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, 680 (1973).

Third, defendants emphatically deny any intent to discriminate. They point out that they conducted an extensive campaign to recruit black applicants in 1968 and 1969 and that two of the three Civil Service Commissioners as well as six of the ten named defendants are black. They also note that the Civil Service Commission discussed the disparate effect of the AGCT examination on blacks but were unable to locate a written aptitude examination which did not also have a disparate effect. While impressed with the good faith of defendants from 1968 to date, the Court cannot, as a matter of law, rule that the good faith efforts are sufficient to negate a prima facie showing of discrimination on the examination. The law permits an inference of a discriminatory intent when a practice having a highly disparate racial effect is used without an investigation to ascertain if the rest is predictive of job performance, regardless of the good faith of the individuals involved. Furthermore, the inability of defendants, after a few telephone inquiries, to locate a fairer test does not excuse the continued use of an examination with a highly disparate effect if the test is not predictive of job performance.

■ For these reasons, plaintiffs have presented a prima facie showing of racial discrimination. This is not, of course, equivalent to a showing of unlawful discrimination but is sufficient to require that defendants demonstrate that the AGCT results are predictive of job performance.

### 2. *Validity of AGCT for Police Department.*

■ Once a prima facie showing of racial discrimination has been presented, it is unclear what standard of review is applied regarding the justifications given for using the examination. The First Circuit standard of review was stated in Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972):

It [the public employer] may not . . . rely on any reasonable version of the facts, but must come forward with convincing facts establishing a fit between the qualification and the job. Id. 732.

In accord, The Shield Club v. City of Cleveland, *supra*. The Second Circuit in Chance v. Board of Examiners, 458 F.2d 1167, 1177 (2d Cir. 1972), required defendants after a prima facie showing to satisfy a "heavy burden of proof" on the question of whether the examination was job-related. See *Bridgeport Guardians, Inc., supra*. Eee also Harper v. Mayor & City Council, 359 F.Supp. 1187 (D.Md.1973) ("Employment tests which are shown to eliminate a disproportionate percentage of one racial group must be demonstrably accurate measures of job performance.") ; Commonwealth of Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1090–1092 (E.D.Pa.1972), aff'd in part by equally divided court, rev'd on other grounds, 473 F.2d 1029 (3d Cir. 1972) (en banc). In essence, the defendant is required to prove to the Court that the examination having a disparate effect is demonstrably job-related. Defendants here attempt to provide such evidence that the AGCT is a valid predictor of job performance through three arguments.

### a. AGCT Manual

Defendants argue that the Technical Manual for the AGCT provides adequate evidence that the AGCT is job-related. However, the Manual discusses no study relating the AGCT to performance as a police officer. The only validation studies reported in the Manual related to performance in the military vocational schools (including a police academy) and other educational institutions. Moreover, the AGCT validation studies were apparently done with respect to whites only. There is no evidence in the Manual that the AGCT is a valid predictor of performance for blacks. Therefore, the AGCT Manual is inadequate to show that the examination is job-related.

### b. Subjective Analysis

Defendants reason that because their Police Department is, in their opinion and in that of some others, a good police department, the AGCT must have done a good job of screening police candidates. The number of assumptions implicit in this conclusion are too numerous to mention. If the Court accepted this conclusion, it would also permit the use of discriminatory testing procedures in every instance in which the present employees were performing adequate work. Certainly more is required prior to permitting the continued exclusion of large numbers of black applicants. As Judge Young commented in Harper v. Mayor & City Council, *supra*: "[T]he law does not afford public employers the luxury of reliance on an untested assumption when the tests which proceed from that assumption adversely affect one racial group."

### c. Objective Analysis

Because testing procedures themselves are a product of the psychological community, the proof of their validity must also be based on the psychological standards. *Bridgeport Guardians, supra.* Both plaintiffs' and defendants' experts agreed on the proper procedure in attempting to validate a test regarding job performance.

The method of validation considered preferable by trial experts is criterion-related validity. See EEOC Guidelines, 29 C.F.R. § 1607.5(a). Under criterion-related validity, the defendant is required to demonstrate that the test scores correlate significantly with external variables which are a direct measure of job performance. Id.[11] It requires a job analysis, testing, and then an objective review to determine whether performance on the test relates to success in significant job functions. *Bridgeport Guardians, supra.*

Defendants attempted to meet the criterion-related validity test by showing that AGCT scores correlated significantly with the police training course grades, promotion, and criteria for promotion—the promotional examination score and the efficiency-in-service ratings. Defendants' expert, Dr. Byron Svetlik, admitted however that he was unable to state that any of the above-listed measures correlated with job performance and admitted that he knew of no job analysis. In addition, he admitted that the efficiency-in-service ratings were subjective in nature and were not done in such fashion that he would predict them to be reliable measures of job performance. There was no indication that the promotional examination results, the police academy grade, or the promotion (a partial result of the efficiency-in-service and promotional examination) were related to job performance. Furthermore, defendants could not relate the AGCT scores with any measures relating to blacks. In fact, the numbers of blacks hired are insufficient to provide the analysis. The fact that no blacks have ever been promoted makes slightly suspect the fairness of the efficiency-in-service ratings, promotional exam and other indicia of promotion. In essence, all defendants have done is related one unvalidated testing or evaluating method with another. The other testing methods may or may not have a disparate effect on blacks as well as may be totally unrelated to job performance.

The Court also permitted evidence on two additional methods of validation-content and construct validity. Content validity involves the identification and testing of certain job-related skills. Since applicants for police officer are trained and are not expected to have certain skills at the time of application, this method of validation would not be relevant here. Constructive validity involves the determination of which con-

---

11. The Guidelines adopt the procedures approved by the American Psychological Association in "Standards for Educational and Psychological Tests and Manuals." The latter publication discussed test validity on pages 12 through 24.

structs or traits are required for job performance, the selection of a test to measure those traits, and then the subsequent testing to determine if the test is predictive of the traits desired. Defendant's expert, Dr. Lawrence Perney, testified that in his opinion the AGCT screened for eighth grade level vocabulary (although a better educated person would be expected to excel) space perception and twelve-grade level mathematics. However, he admitted that he did not know whether and to what degree these traits were those which would be necessary for job performance as the police officer. Defendants also presented testimony that some level of reasoning, language, math and perceptual ability was needed to make reports of traffic accidents and testify in court. However, there was no evidence of the level of skill required for performance. With no job analysis to determine the level of ability required in a given area, defendants may well be screening out persons for lack of skill in an area for which the level tested is not required.[12] Furthermore, defendants did not follow-up the test to determine whether scoring on the AGCT correlated with the existence of the traits desired.

In essence, defendants are contending that a general aptitude test to measure ability may be used because they want fairly intelligent police officers. If such a justification were permitted for police officers without research as to the level of competence required with respect to language or mathematics, it is difficult to imagine what kind of employment could not also justify the use of such a test. At the same time, the expert testimony related that the studies to date indicate that blacks often perform far better on the job than aptitude tests indicate. Thus, a ruling that the need for such vague traits as general intelligence, language skills and ability to reason may support the use of such aptitude tests as the AGCT which have a highly disparate effect on blacks, without a study of the level of skill required for the job, will effectively preclude any challenge to testing procedures. For this reason, the Court will require a more specific job validation than that attempted by defendants prior to subsequent use of the AGCT.

## B. *Sex Discrimination Claim.*

Since only two female applicants have taken the AGCT to qualify for police officer in East Cleveland, the major issue presented by the claim that the examination discriminates on the basis of sex is the method of review to be applied when the numbers are too small to permit a conclusion as to the disparate effect of the examination.

Several courts faced with a similar issue have refused to rule that a prima facie case of discrimination has been established. Castro v. Beecher, *supra;* *Bridgeport Guardians, Inc., supra.* Indeed, the Court is unable to find any authority for requiring defendants to validate the test where the statistical evidence of disparate effect is insufficient and there is no evidence of discriminatory intent in adopting the examination.

At the same time, it is troublesome that the evidence presented indicates a high probability that the examination will have such a disparate effect. Although the studies in the field show that women and men score differently with respect to math and verbal, defendants have used an examination designed and originally normalized for men only. Furthermore, the AGCT Technical Manual indicates that when attempts were made to normalize the AGCT with respect to women, the women scored lower on the average than men in the same group. Technical Manual, supra at 14–16, 30. Finally, one of plaintiffs' experts testified to a likelihood of dispar-

12. For example, it is conceivable that the level of vocabulary required to score sufficiently well to be certified is well beyond that needed for daily police activities. Vocabulary tests are often particularly discriminatory against minority groups and may result in screening out many blacks sufficient to perform police work well.

ate effect regarding the spatial relations portion of that examination and regarding the guessing penalty.

While normalization would therefore be advisable, the Court is without authority to compel it as a constitutional requirement.

### C. *Conclusion*

Although the discussion must of necessity deal with the evidence and the law related to discrimination, the Court cannot help but consider the effect a finding of racial discrimination with respect to the written examination will have on a small suburban police department. Proper validation of the testing under the procedures described by plaintiffs' expert Dr. Barrett and defendants' expert Dr. Svetlik will be costly and time-consuming.

It does appear, however, that practical means to achieve a fair test do exist through a pooling of efforts. What is most offensive is the use of a discriminatory examination which has not been related to performance of the police officer anywhere known to defendants. The Court may take judicial notice of a growing number of police departments which are seeking a test which either does not have a disparate effect on blacks or which is related to the job performance of a police officer. *Bridgeport Guardians, Inc., supra; The Shield Club, supra.* It is reasonable to conclude that, just as individual police departments have not written their own examinations in the past, they may also draw on a common fund for a new examination which will meet the requirements of the Fourteenth Amendment.

The Court is also concerned with the fear expressed during trial by plaintiffs' expert Dr. Svetlik that the Court decisions regarding discrimination may impair the progress made in the adoption of objective rather than subjective examinations for public employment. Still, it concludes on the basis of the trial testimony that because the factors which produce a cultural bias in test results are known in the testing field, it will be feasible to write a culture fair test for police applicants. In addition, the Court is unconvinced that tests which discriminate are really "objective" where they are not demonstrably job-related. The Court agrees with Judge Goldberg's analysis in his dissent to Allen v. City of Mobile, 466 F.2d 122 (5th Cir. 1972):

> It is now recognized that a test can be impeccably 'objective' in the manner in which the questions are asked, the test administered, and the answers graded, and still be grossly subjective' in the educational or social milieu in which the test is set. Id. 123.

For these reasons, the Court concludes that its ruling in this case should not set back the healthy trend toward the use of objective standards in public employment.

■ The evidence shows that the examination in this case discriminates against black applicants. In light of this discrimination, defendants have the burden of demonstrating to the Court that the examination is job-related. The evidence indicates that the AGCT which was developed on white enlistees to classify within the segregated Army has never been validated regarding performance of either whites or blacks as police officers. The Court rejects the attempts to validate the test in East Cleveland with respect to promotional criteria, since these criteria have never themselves been related to job performance and since no black has been promoted in the history of the Department, and with respect to a police training test score, since this too has not been shown to relate to job performance. Given an examination which has a grossly disparate effect on black applicants, the defendants' evidence was not sufficient to demonstrate job-relatedness.

Regarding the claim of sex discrimination, a different situation is presented. Plaintiffs have not shown that the examination has been a barrier to employment for women. Therefore, the Court does not find a sufficient basis to

invalidate the examination as it relates to sex.

## V. VETERAN'S PREFERENCE

Plaintiffs challenge the timeliness of applying a preference for veterans on the grounds that it discriminates on the basis of sex, that it amounts to a special law which is prohibited under the Ohio Constitution, and that it violates Ohio Rev.Code § 143.16.

The statute requiring a preference for veterans provides in relevant part:

All applicants for positions and places in the classified service shall be subject to examination which shall be public, . . . provided any soldier, sailor, marine, coast guardsman, member of the auxiliary corps as established by congress, member of the army nurse corps or navy nurse corps, or red cross nurse who has served in the army, navy, or hospital service of the United States, and such other military service as is designated by congress, including World War I, World War II, or during the period beginning May 1, 1949, and lasting so long as the armed forces of the United States are engaged in armed conflict or occupation duty, or the selective service or similar conscriptive acts are in effect in the United States, whichever is the later date, who has been honorably discharged therefrom, or transferred to the reserve with evidence of satisfactory service, and is a resident of Ohio, may file with the director a certificate of service or honorable discharge, whereupon he shall receive additional credit of twenty per cent of his total grade given in the regular examination in which he receives a passing grade. Such examination may include an evaluation of such factors as education, training, capacity, knowledge, manual dexterity, and physical or psychological fitness. Examinations shall consist of one or more tests in any combination. Tests may be written, oral, physical, demonstration of skill, or an evaluation of training and experience and shall be designed to fairly test the relative capacity of the persons examined to discharge the particular duties of the position for which appointment is sought. Ohio Rev.Code § 143.16

Defendants apply the veterans preference to the written examination before deciding whether the applicant may take the oral examination. In addition, they apply the preference prior to determining whether the applicant has passed the examinations. Such practices are in violation of the procedure prescribed by state statute—namely that the department should first determine whether the applicant has passed the entire examination (including both written and oral) and only then apply the veterans preference.

Since the Court may rule on this claim under state law on the basis of its pendent jurisdiction, it does not reach the constitutional arguments raised by plaintiffs.

## VI. ATTORNEY'S FEES

Since there is no statutory provision for attorneys' fees under 42 U.S.C. § 1983, attorneys' fees should be allowed only when public policy would require it. Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972), cited in Northcross v. Board of Education, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48, 51 n.2 (1973). The Court should consider the degree to which a public right is asserted by plaintiff and the extent to which defendant has engaged in deliberate wrongdoing. Id.; Lee v. Southern Home Sites Corp., 444 F.2d 143 (5th Cir. 1971).

In this case, defendants have not deliberately embarked on a course of discrimination at least with respect to racial discrimination and have, in fact, prevailed in their defense against one of plaintiffs' claims. In the exercise of its discretion, the Court declines to award attorneys' fees to plaintiffs.

## VII. RELIEF

On the basis of the reasoning above the Court rules that:

1. Defendants' enforcement of the minimum height and weight requirements for police officer applicants in East Cleveland unlawfully discriminates against women;

2. Defendants' use of the AGCT to screen applicants unlawfully discriminates against blacks; and

3. Defendants' application of the veterans' preference prior to determining whether the candidate is qualified violates Ohio law.

 In determining the proper relief, the Court must also consider any history of discrimination. With respect to the discrimination, the evidence indicates that defendants have already made positive efforts to erase the effects of past discrimination through recruitment. Therefore, the Court is not inclined to order affirmative relief with respect to past discrimination. However, it will enjoin the further use of the AGCT examination which unlawfully discriminates against black applicants.

With respect to sex discrimination, the Court is convinced that there has been past discrimination. However, because the Court does not know the numbers of those women who would have applied but for the height and weight requirements, it is inclined to order only limited affirmative relief for the past discrimination. It will, however, enjoin further enforcement of the minimum height and weight requirements.

The Court is aware that there is some leeway in fashioning relief. It therefore requests the defendants to file a proposed plan for implementation of the Court's rulings within twenty days of the date of this Order. The plaintiffs are ordered to respond to the plan within ten days thereafter. A hearing to discuss final relief will be held on October 12, 1973. Pending such a hearing the interim relief heretofore granted will remain in effect.

It is so ordered.