Gertrude **BEAL** et al., Plaintiffs-
Appellants,

v.

**John V. LINDSAY, individually and as
Mayor of The City of New York,
et al., Defendants-Appellees.**

No. 2, Docket 72–1194.

United States Court of Appeals,
Second Circuit.

Argued Sept. 11, 1972.

Decided Oct. 5, 1972.

Kenneth G. Schwarz, Acting Atty.in-Charge, New York City (Morrisania Legal Services, and Cornelia McDougald, New York City, of counsel), for plaintiffs-appellants.

Nina Goldstein, New York City (J. Lee Rankin, Corp. Counsel, and Stanley Buchsbaum, New York City, of counsel), for defendants-appellees.

Before FRIENDLY, Chief Judge and LUMBARD and FEINBERG, Circuit Judges.

FRIENDLY, Chief Judge:

■ This is the first case requiring us to apply the path-breaking decision in Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5 Cir. 1971), adhered to by a divided court en banc, 461 F.2d 1171 (5 Cir. 1972). While we accept the principle that serious and continued discrimination in the level of effort expended on municipal services to areas predominantly populated by minority racial groups violates the equal protection clause, even without direct proof of "bad faith, ill will or any evil motive," 461 F.2d at 1172, we have concluded that the complaint here was properly dismissed, although not for the reasons stated by the district judge.

Crotona Park is the smallest of four multi-community parks maintained by New York City in the Borough of the Bronx. The complaint brought against New York City officials by individual black and Puerto Rican residents of areas surrounding the park and an association called Bronx Citizens for a Cleaner Park alleged that, of the four Community Planning Districts directly serviced by the park, the black and Puerto Rican population equals or exceeds 70% in three, and the percentage receiving public assistance in the four districts ranges from 22.1% to 42.2%. For the Bronx as a whole, the percentage of black and Puerto Rican residents is 32.5%, and approximately 13% receive public assistance. The proportions of black and Puerto Rican residents and persons receiving public assistance for the Community Planning Districts surrounding the other three parks in the Borough—Van Cortlandt, Pelham Bay, and Bronx—are significantly lower than in the districts surrounding Crotona Park and generally lower than for the Borough as a whole.[1] The complaint alleged that:

The maintenance of Crotona Park is almost nonexistent. What was once one of the major parks in the city is now a mass of broken glass and litter strewn about. Most of the benches and fencing are broken and non-usable. Numerous abandoned automobiles often litter the roads running through the park for days. Little or no attempt has been made to clean up the park despite numerous requests by residents of the community.

On the contrary, Van Courtland Park, Pelham Bay Park and Bronx Park are kept in near spotless condition. During warm weather seasons, numerous park personnel can be seen removing the litter created by weekend crowds. Within a couple of days, these parks are spotless.

It went on to claim that proportionally fewer recreational, maintenance and supervisory personnel were assigned to Crotona than to the three other parks. It sought injunctive and declaratory re-

---

1. The details are as follows:

| | % Range of Nonwhite Persons in Surrounding Community Planning Districts |
|---|---|
| Bronx Park | 2.8–37.5 |
| Pelham Bay Park | 5.7–12.3 |
| Van Cortlandt Park | 2.8–19.4 |
| Crotona Park | 37.5–82.6 |
| Borough of Bronx | 32.5 |

| | % Range of Persons Receiving Public Assistance in Surrounding Community Planning Districts |
|---|---|
| Bronx Park | 1.24–22.1 |
| Pelham Bay Park | 2.05– 3.68 |
| Van Cortlandt Park | 0.53– 2.16 |
| Crotona Park | 22.1–42.2 |
| Borough of Bronx | 13 |

lief against the City's failing to equalize the equipment, facilities, services and repairs in Crotona with that in the three other parks.

The defendants responded with a motion under F.R.Civ.P. 12(b) for an order dismissing the complaint for lack of jurisdiction over the subject matter and failure to state a claim upon which relief could be granted. However, as permitted by the final sentence of F.R.Civ. P. 12(b), they appended a detailed affidavit by defendant August Heckscher, Administrator of the Parks, Recreation and Cultural Affairs Administration. Not disputing the allegations concerning the deplorable condition of Crotona Park, he maintained that this was not the consequence of any lack of effort by the City. He asserted that, on the contrary, the municipal effort at Crotona was as good as or better than that at other Bronx parks. Although Crotona contained only 146.59 acres in contrast to the much larger acreage of the three other parks,[2] a far greater number of park personnel was assigned to Crotona. He attributed the failure of the City's maintenance efforts to the high degree of vandalism at Crotona Park and Pool. He stated that his Administration had held many meetings with community representatives to discuss how the situation could be ameliorated; that $75,000 had been set aside to hire an architect or planner to work out a redevelopment plan; and that it was contemplated that $1,500,000 would be utilized for that purpose. The affidavit concluded with an assertion that the City's "consistent policy has been to provide the Crotona Park community with a high level of recreational facilities, subject to budgetary restrictions," and a denial of discrimination on the basis of race or income.

Plaintiffs countered with an affidavit of Aramentha Hamilton, Chairman of Bronx Citizens for a Cleaner Park. She noted that when she had moved into the neighborhood in 1964, Crotona "was a well-run, well-maintained park" but that, as the racial composition of the neighborhood had become more largely black and Puerto Rican, services at Crotona had deteriorated, whereas the racial mix in the neighborhoods surrounding the other parks and the services had been more stable. Specifically, there was no longer a rowboat concession at the Crotona Park lake, which was polluted with garbage; charcoal grills had disappeared; benches were broken and fences down; the comfort stations were no longer in operation; the park was strewn with litter and broken glass; and special events had been largely discontinued. She raised questions concerning the validity of the Administrator's statistics. Perhaps the workers shown for Crotona included some who were there on a temporary basis; some of the figures for Crotona included workers at the Crotona Pool, whereas the figures for the other parks did not include workers at pools, golf courses, a beach or the Bronx Zoo and Botanical Gardens; a disproportionate number of the Crotona Park workers were assigned to the tennis courts which were used predominantly by whites from outside the neighborhood; the figures did not reflect the experience of or the equipment used by the workers; and Van Cortlandt and Pelham Bay Parks had a much larger proportion of forested areas requiring little or no maintenance. Question was also raised with respect to the summer assignment of Urban Corps Recreation Interns and Neighborhood Youth Corps Workers.

2. These were as follows:

|  | Acres |
|---|---|
| Van Cortlandt | 1114.64 |
| Pelham Bay | 2117.8 |
| Bronx | 721 |

Mr. Heckscher returned to the fray with a reply affidavit designed to deal with these criticisms. Despite a 26% loss in borough park personnel since 1964, the number assigned to Crotona had increased. The rowboat concessionaire had refused to continue due to extensive vandalism, and the lake had been cleaned periodically. The Administration had discontinued repair and replacement of charcoal grills in all parks because of public preference for individually owned portable grills. Efforts of the park crews to repair benches and bench slats had been augmented by the services of contractors, and these efforts had been far more extensive in Crotona than in the three other parks. Vandalism had rendered the comfort stations inoperable; their complete rehabilitation would be included in the redevelopment plan. The original affidavit had in fact given a breakdown of the personnel employed at the park and at the pool, and pool personnel assisted in the park when their services were not needed at the pool. The Bronx Zoo and Botanical Gardens are not part of the park system. The Crotona figures did not include additional employees specifically assigned to counter the effects of vandalism. Only three employees were assigned to the tennis courts, and a tennis professional was hired each summer to give free lessons to youth. Assignment of park personnel within a borough is not based upon experience. The cleared areas in Van Cortlandt and Pelham Bay Parks were larger than Crotona. The statistics in the opening affidavit did not include summer youth workers. However, an overwhelming proportion of these had been assigned to Crotona. In 1971 Crotona had more concerts and special events than any of the three other parks.

The district judge dismissed the complaint for failure to state a claim on which relief could be granted. He attached importance to the availability of the other parks to the residents of the Crotona area, and suggested a failure to demonstrate the state action required for the maintenance of an action under 42 U.S.C. § 1983 and its jurisdictional implementation, 28 U.S.C. § 1343(3). He also thought that the record did not disclose any actual controversy warranting declaratory relief.

■ We cannot accept any of these grounds. While the availability of other parks is a factor worthy of consideration and to some extent does differentiate a park case from one involving discrimination in paving, streetlighting or sewerage, it is not a complete answer, particularly to a complaint brought by citizens who may lack the means to transport themselves and their families to distant parks. One need not look further for state action when the complaint charges officers of a city with failure to obey the Constitution in the discharge of their duties. See Monroe v. Pape, 365 U.S. 167, 171–172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Adickes v. S. H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The controversy was quite as justiciable as in Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2 Cir. 1968); Hawkins v. Town of Shaw, *supra,* and other cases too numerous to mention. However, reversal is not called for if defendants were entitled to summary judgment under the final sentence of F. R.Civ.P. 12(b).

■■ Implicit in plaintiffs' case is the proposition that the equal protection clause not merely prohibits less state effort on behalf of minority racial groups but demands the attainment of equal results. We very much doubt this, when, as here, the factor requiring added effort is not the result of past illegal action. Nothing in Hawkins v. Town of Shaw, *supra,* suggests that if the town had installed modern street lamps in the black quarter and these were repeatedly vandalized, the town must go on and on, even though this would mean a greater unit expenditure than in other areas. In a case like this, the City has satisfied

its constitutional obligations by equal input even though, because of conditions for which it is not responsible,[3] it has not achieved the equal results it desires. *Cf.* Fessler & Haar, Beyond the Wrong Side of the Tracks: Municipal Services in the Interstices of Procedure, 6 Harv. Civ.Rights-Civ.Lib.L.Rev. 441, 461–463 (1971).[4] How much further to go beyond equal effort in order to redeem Crotona Park is a matter of municipal policy, not of constitutional command. We add that, in determining whether there has been equality of effort, federal courts must not hold municipalities to standards of precision that are unattainable in the process of government. Judge Tuttle's panel opinion in Hawkins v. Town of Shaw, *supra*, 437 F.2d at 1288, relied on "a *substantial* qualitative and quantitative inequity in the level and nature of services accorded 'white' and 'black' neighborhoods in Shaw" (emphasis supplied), and the opinion for the full court en banc emphasized that "we do not imply or suggest that every disparity of services between citizens of a town or city creates a right of access to the federal courts for redress." 461 F. 2d at 1173. The practical problems set forth in the dissenting opinions of Judges Roney and Clark, 461 F.2d at 1178–1186, also merit careful consideration, even though in our view the majority was justified in its decision on the facts in *Town of Shaw.*

With this much established, we would entertain no doubt of the propriety of the rendition of summary judgment for the defendants if the judge had made clear that he was considering this and that, if plaintiffs desired, they could submit further affidavits or take the deposition of the Administrator or other appropriate city officials. The rule of Arnstein v. Porter, 154 F.2d 464, 468 (2 Cir. 1946), that summary judgment may not be rendered when there is the "slightest doubt" as to the facts no longer is good law. First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Dressler v. MV Sandpiper, 331 F.2d 130 (2 Cir. 1964). When the movant comes forward with facts showing that his adversary's case is baseless, the opponent cannot rest on the allegations of the complaint but must adduce factual material which raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts. After Mr. Heckscher's first affidavit, plaintiffs, while raising no issue of veracity, did challenge the completeness of the showing and alleged some new facts. But the Administrator's reply affidavit, served ten days before the decision, almost completely met all the points the answering affidavit had raised. Indeed, the only ones we can find that were not fully answered were the suggestions that the equipment in Crotona Park might be

---

3. The plaintiffs have not argued that the vandalism afflicting the park can be attributed to police protection that was unequal or unreasonably low in light of other demands on the police.

4. Fessler & Haar, examining the implications of Hawkins v. Town of Shaw, *supra*, contrast the concepts of equality of services adopted by the district court and the panel in that case. The district court, they find, adopted a concept rooted in provision of "minimally adequate performance," whereas the panel applied the "apparently more ambitious claim of absolute equality at the level of services being provided in favored neighborhoods."

6 Harv.Civ.Rights-Civ.Lib.L.Rev. at 461. They conclude that the panel's input equality theory is preferable because it avoids the "nearly impossible task of determining the dimensions of bare minima," *id.* at 462, but reach no firm conclusion how far equalization of output is constitutionally required. In these early days of developing the implications of *Town of Shaw,* it seems wiser, particularly in view of the difficult problems with respect to remedy, generally not to go beyond requiring equality of input, except where something more is needed to remedy the effect of past unlawful conduct.

less modern, that perhaps the workers were less experienced than in the other three parks, and that the Administrator's statistics for Van Cortlandt and Pelham Bay Parks did not include golf course, pool and beach employees. But even if we assume that a deposition or a trial might resolve these issues somewhat in plaintiffs' favor, this would not warrant the granting of the relief they seek. The City's showing that it had made not merely an equal but a disproportionate effort in favor of Crotona Park, even taking into account what we will assume to be a greater intensity of use of its cleared areas, was so overwhelming that a resolution of these three points in plaintiffs' favor would not tip the scales. Where, as here, plaintiffs could not reasonably make any allegations of racial bias on the part of the City administration, the case for dispensing with a trial on issues of "legislative fact" is forceful in judicial as well as in administrative proceedings. See Hahn v. Gottlieb, 430 F.2d 1243, 1248 (1 Cir. 1970); Davis, Administrative Law Treatise § 7.02, at 413 (1958); Administrative Law Text § 7.05, at 164 (1972). We do not read Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972), as precluding a court of appeals from affirming in such a case where it is apparent that reversal and remand would be fruitless; there it seemed highly likely that the appellant would prevail. See concurring and dissenting opinion of Mr. Justice Douglas, 405 U.S. at 672, 92 S.Ct. 1232.

We do not minimize the gravity of plaintiffs' grievances. But, in view of the level of the City's efforts, the problem resulting from the inefficacy of its expenditures to keep Crotona Park in its previous satisfactory state is one to be resolved through cooperative efforts by the City and the community surrounding the park, which also has its responsibilities, not by interposition on the part of a federal court.

The order dismissing the complaint is affirmed on the grounds herein stated. No costs.