Mary **BURNER** et al., Plaintiffs,

v.

Walter E. **WASHINGTON** et al.,
Defendants.

Civ. A. No. 242–71.

United States District Court,
District of Columbia.

July 15, 1975.

William H. Allen, Washington, D. C., for plaintiffs.

Thomas Nedrich, Asst. Corp. Counsel, Washington, D. C., for District of Columbia defendants.

## MEMORANDUM–ORDER

GASCH, District Judge.

Plaintiffs herein allege that various municipal services in the District of Columbia were provided in a discriminatory manner in violation of Fifth Amendment equal protection and due process [1] and in violation of certain statutory and common law rights.[2] The complaint named as defendants various Federal and local officials, the District of Columbia, the Washington Metropolitan Area Transit Authority and the United States. There is no need to review here the procedural history of the

---

[1]. Although the Fifth Amendment has no equal protection clause, it is well-settled that a violation of equal protection may be so extreme that it constitutes a deprivation of due process. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

[2]. The common law right asserted is that of any citizen to be given services on an equal footing with all other citizens. The plaintiffs also point to certain statutes of the District of Columbia which, they say, implicitly guarantee their right to equal treatment. *See* D.C.Code Ann. §§ 4–119, 4–139 (relating to the duties of the police commissioner and the duty not to enforce discriminatory laws) ; D.C.Code Ann. § 4–401 (stating that the Fire Department encompasses all of the District of Columbia) ; D.C.Code Ann. § 8–210 (authorizing the Recreation Board to undertake a comprehensive program of public recreation) ; D.C.Code Ann. § 7–608 (authorizing construction, improvement and repair of sidewalks).

case.[3] The matter is now before the Court on cross-motions for summary judgment filed on behalf of plaintiffs and of all District of Columbia defendants. At issue is whether the District of Columbia ("District") has discriminated in the provision of municipal services in five general categories. These areas are: police services, fire services, recreation services, trash removal services and provision for sidewalks. In general, plaintiffs assert that residents of the Anacostia area of the city receive less services in these categories than do persons living in that area of the District which is west of Rock Creek Park.[4]

## I. *Legal Framework.*

 We start with the principle that invidious racial discrimination may be shown either by proof of discriminatory intent or of discriminatory effect.[5] Such an improper effect exists where it is shown that the action in question promotes or encourages discrimination.[6] Such effect also exists where an ostensibly neutral action has the inevitable effect of tying present rights to the discriminatory patterns of the past [7] or of placing a special burden upon blacks or other minorities.[8] Discrimination by race is a "suspect classification" which may only be justified in the light of a "compelling governmental interest." [9] Intent or good faith is no defense in cases of racial discrimination.[10] While the main principles of the law are thus clear, the Court must inquire further in order to determine the meaning of these principles in the context of municipal services.

The leading case on discrimination in the provision of municipal services is *Hawkins v. Town of Shaw.*[11] In *Hawkins,* certain black plaintiffs urged the inadequacy of services in the categories of paving, sewers, drainage, water mains, hydrants and street lighting. Plaintiffs

3. It suffices to note generally that certain claims have been dismissed and others are being held in abeyance pending resolution of the current matter.

4. Anacostia is that area of the city which is east of the Anacostia River but within the borders of the District of Columbia. The area west of Rock Creek Park is likened by the plaintiffs to Anacostia in that the land areas are about equal and each is separated from the rest of the District by a "physical barrier," viz: the River and the Park. Both areas are largely residential in nature. Anacostia, however, is 90 percent black while the area west of the Park is 98 percent white. About 30 percent of the District's population lives in Anacostia contrasted with about 9 percent west of the Park. The median income in Anacostia is lower than that west of the Park. The populace in Anacostia is generally younger than that west of the Park.

5. *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 500, 17 L.Ed.2d 431 (1967) (section of state constitution was added with intent of repealing certain fair housing statutes and establishing purported constitutional right of private discrimination in housing. This significantly involves state in encouraging discrimination and must be overturned).

6. *Id.*

7. *See Gaston County v. United States,* 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969) (literacy test for voters has discriminatory effect because of results of segregated educational systems of the past).

8. *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969).

9. Under the traditional view of equal protection, of course, a classification must be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate governmental interest. *See Frontiero v. Richardson,* 411 U.S. 677, 683, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Jefferson v. Hackney,* 406 U.S. 535, 546, 549, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Some classifications, including race, have been regarded by the Court as "inherently suspect." *See Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida,* 379 U.S. 184, 191–92, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Such suspect classifications are to be subjected to the "most rigid scrutiny" and can only be justified on the basis of some overriding and compelling governmental interest. *Loving v. Virginia, supra; McLaughlin v. Florida, supra.*

10. *Norwalk CORE v. Norwalk Redev. Agency,* 395 F.2d 920, 931 (2d Cir. 1968); *Hobson v. Hansen,* 269 F.Supp. 401, 497 (D.D.C.1967).

11. 437 F.2d 1286 (5th Cir. 1971), *aff'd en banc* 461 F.2d 1171 (1972).

established that 97 percent of all black residents in Shaw lived in "black only" neighborhoods and that 98 percent of all homes situated on unpaved streets were in these areas. Over 97 percent of all homes without sewers were black owned. Only 20 percent of the black populace had sewers while 99 percent of whites had that service. All of the superior type of street lights were in white areas. The two areas which had the least adequate water pressure contained 63 percent of all blacks in Shaw. The plaintiffs alleged that these disparities were the result of a long history of racial discrimination in the town.[12]

The Court in *Hawkins* was thus confronted with

undisputed statistical evidence which . . . clearly showed a substantial qualitative and quantitative inequity in the level and nature of services accorded "white" and "black" neighborhoods in Shaw.[13]

In these circumstances, the Court held that a *prima facie* case of racial discrimination had been made, requiring the imposition of the "compelling governmental interest" test for equal protection purposes.[14]

Two other cases merit detailed discussion. In *Hobson v. Hansen*,[15] the Court was concerned with alleged racial discrimination in the District of Columbia's public school system. The school system had admittedly been engaged in *de jure* segregation as late as 1954, creating an extensive history of segregation. That history, according to the *Hobson* plaintiffs, gave rise to the discriminatory policies which they sought to end.[16] The Court held that, once a history of *de jure* segregation was shown, defendants had the burden to show that any remaining segregation stemmed from racially neutral policies.[17] The defendants in *Hobson* were unable to meet this burden.

In *Beal v. Lindsay*,[18] plaintiffs claimed discrimination in the maintenance and upkeep of a New York City park (Crotona Park) as compared to other nearby parks.[19] In general plaintiffs alleged that the subject park was littered, dirty and without appropriate facilities while the nearby parks were clean, well-maintained and adequate for their users' needs.[20] The City defended by asserting that the level of services given to the subject park was equal to or better than that accorded to the nearby parks but that the results were unequal since Crotona Park was subject to a much higher rate of vandalism than were other parks.[21] The Court upheld dismissal of the case saying that, at least where the inequality was not the product of an action itself illegal, equality of result was not required.[22] Substantial equality of input was constitutionally sufficient, said the Court, pointing out that *Hawkins v. Town of Shaw* turned on the substantial qualitative and quantitative difference in the input of services to black and white neighborhoods.[23]

---

12. 437 F.2d at 1288–92.

13. *Id.* at 1288.

14. *See, supra,* note 9 and accompanying text. The *Hawkins* Court found no compelling governmental interest which would justify the discrimination. It considered the town's intent to be immaterial.

15. 269 F.Supp. 401 (D.D.C.1967).

16. *Id.* at 417–18.

17. *Id.* at 417.

18. 468 F.2d 287 (2d Cir. 1972).

19. Crotona Park was located in the Bronx in a neighborhood having a much higher percentage of black people, Puerto Ricans and persons on public assistance than was true in the rest of the Bronx. *Id.* at 288. The other three public parks in the Bronx were located in areas having much lower percentages of minorities and disadvantaged groups. *Id.*

20. *Id.* Plaintiff also claimed that fewer appropriate personnel were assigned to Crotona Park than were posted to the other parks. *Id.*

21. *Id.* at 289.

22. *Id.* at 291.

23. *Id.*

■ From these salient decisions, the Court derives the following basic principles for application to the case at bar. In order to prevail herein, plaintiffs must show a substantial inequity in the input of municipal services as among various groups and that some logical nexus may be discerned between these inequities and possible discrimination based on race or other suspect classification. Such a nexus may be inferred, as in *Hawkins,* from the linking of present policies to those followed during a prior history of overt racial discrimination. In *Hobson,* the Court found the nexus both in the long history of discrimination and in the fact that the school policies had extreme detrimental impact solely on the black minority.[24] Once these elements are established, there exists a *prima facie* case of racial discrimination. The burden then shifts to the defendants to show either that their policies and actions are justified by some compelling governmental interest or that they are, in fact, racially neutral in application.

## II. *Application to the Case at Bar.*

### A. *Police Services.*

The Court has had the benefit of an Urban Institute study of police services in Washington, D. C.[25] The study concludes that police services are conducted according to acceptable management standards and that police services are accorded on a relatively equal basis to Anacostia and the area west of the Park.[26] Plaintiffs have stated that they accept this study as valid and accurate. They nonetheless request the Court to supervise police operations to insure that the police continue to provide services on a non-discriminatory basis.[27]

■■ The ground for this request is plaintiffs' allegation that equality of police services in the District of Columbia is of very recent vintage and their fear that, without supervision, the police might return to old and improper ways. The Court regards the allegation in question as without substantial foundation (it is stoutly denied by defendants). Even if it were true, however, the Court would deem it irrelevant. All parties accept the Urban Institute study as a valid and accurate evaluation of the current situation. That study indicates equality in police services. Any prior inequality has been remedied by the political and administrative machinery of the District itself. Since in our system courts should intervene in governmental affairs only when those affairs operate so as to fail to accord basic rights to persons affected thereby, it is presently neither desirable nor proper for this Court to act in regard to police services.[28]

---

24. Such a logical nexus may also be shown, of course, by proof of actual, explicit or intended racial segregation. *See Crow v. Brown,* 332 F.Supp. 382 (N.D.Ga.1971), *aff'd per curiam* 457 F.2d 788 (5th Cir. 1972) (avowed desire to exclude low-income blacks); *Gautreaux v. Chicago Housing Auth.,* 296 F. Supp. 907 (N.D.Ill.1969) (evidence showed intentional effort to exclude blacks from certain areas).

25. P. Block, *Equality of Distribution of Police Services—A Case Study of Washington, D.C.,* No. 712-12-1, Urban Institute (Feb. 1974) [hereinafter cited as *"Police"*].

26. *Police* at IX–XI.

27. Such supervision would take the form of requiring the police to furnish the Court a report of their activities at regular intervals.

28. It is perhaps not inappropriate in this context to recall the words of Learned Hand:

I do not believe that [judges'] independence should be impaired because of their constitutional function. But the price of this immunity, I insist, is that they should not have the last word in those basic conflicts of "right and wrong—between whose endless jar justice resides." You may ask what then will become of the fundamental principles of equity and fair play which our constitutions enshrine; and whether I seriously believe that unsupported they will serve merely as counsels of moderation. I do not think that anyone can say what will be left of those principles; I do not know whether they will serve merely as counsels; but this much I think I do know— that a society so riven that the spirit of moderation is gone, no court *can* save; that

## B. *Recreation Services.*

In the field of recreation services, the Court has also been favored with a study by the Urban Institute.[29] Neither side disputes the validity or accuracy of this study.

No brief summary can accurately state the extensive findings of that study. The general statement may be made, however, that certain indices show that Anacostia is being favored while certain others indicate that the area west of the Park is favored.[30] Thus, Anacostia has received a significantly greater share of capital expenditures since 1960.[31] Similarly Anacostia in fiscal 1973 received a greater share of the operating expenses.[32] The so-called "quantity of opportunity" index [33] shows a general bias in favor of Anacostia except for the 0–19 age group.[34] The "quality of opportunity" index [35] shows that Anacostia is favored over the area west of the Park.[36] Utilization appears heavier in Anacostia than west of the Park.[37] The study concludes:

> that a *prima facie* showing of discrimination against Anacostia residents is

a society where that spirit flourishes, no court *need* save; that a society which evades its responsibility by thrusting upon the courts the nurture of that spirit, that spirit in the end will perish.

L. Hand, "The Contribution of an Independent Judiciary to Civilization" in *The Spirit of Liberty: Papers and Addresses of Learned Hand* (Vintage Books ed. 1959) at 119.

29. D. Fisk & C. Lancer, *Equality of Distribution of Recreation Services: A Case Study of Washington, D.C.*, No. 712–13–1 (Urban Institute, July 1974) [hereinafter cited as "*Recreation*"].

30. *See Recreation* at 37–38 for a capsule summary.

31. *Recreation* at 9.

32. *Id.* at 9–13. 1973 is the only year for which such data is available. Certain of the data may indicate a greater expenditure west of the Park for the 0–19 age group. *Id.* at 12–13. Even this, however, is not clear. *Id.* In any event, parks are used by all age groups; and Anacostia, in general, is greatly favored in the matter of expenditures.

33. This index measures the amount of open space available, number of facilities available, swimming pools, days of operation and personnel assigned.

34. Thus, there is much more open recreational space in Anacostia than west of the Park (615 acres versus 193 acres). *Recreation* at 16. There are more facilities in Anacostia, both on an absolute and on a per resident basis, than in the area west of the Park. *Id.* at 17. There are more swimming pools in Anacostia. *Id.* at 18. The days of operation of facilities is greater (both absolutely and on a per facility and per resident basis) in Anacostia than west of the Park. *Id.* at 20. The number of personnel assigned to Anacostia exceeds that assigned west of the Park whether on an absolute, per facility or per resident basis. *Id.* at 21. There are more pre-school programs in Anacostia than west of the Park. *Id.* at 21–22. For the 0–19 age group, however, all these indices (except swimming pools) show that the area west of the Park is favored. *Id.* at 16–22.

35. This comprises accessibility of facility, variety of program offerings, overall user household rating and "other quality attributes" such as crime rate, cleanliness, etc.

36. Anacostia residents generally live closer to facilities than do persons west of the Park. *Recreation* at 23–24. There are more programs offered in Anacostia on an absolute basis and on a per facility and per person basis (although the area west of the Park is better off so far as the 0–19 group is concerned). *Id.* at 24. A citizen survey of other quality factors revealed no significant differences in response between Anacostia and the area west of the Park (although Anacostia residents seemed marginally more dissatisfied than did residents west of the Park). *Id.* at 24–28. Quality, of course, is a very subjective area which is difficult to measure in any meaningful sense. *See id.* at 22.

37. *Id.* at 30–31. Calculations based on utilization show: that Anacostia receives a greater capital outlay per visit, per user and per child-youth (0–19 age) than does the area west of the Park; and that Anacostia obtains a higher proportion of the operating expenditures on a per visit and per user basis but not on a per child-youth visit basis than does the area west of the Park. *Id.* at 32–34. It was uncertain whether users in one area had a greater "quantity of opportunity" provided than did users in the other area. *Id.* at 34–36. The study points out that the meaning of statistics regarding utilization is quite ambiguous. *Id.* at 29–30.

not clear; such a judgment depends on which measure of service is chosen . . . .[38]

■ The study in question clearly does not show the sort of substantial qualitative and quantitative bias against Anacostia which is necessary to establish a case of discrimination. Indeed, the very opposite appears to be true. Almost every index chosen reflects a favoritism toward Anacostia. Only the 0–19 age group is somewhat disfavored as compared to the area west of the Park. That, in the opinion of the Court, is more due to demographic factors than to any others.[39] Be that as it may, however, plaintiffs have failed to establish a *prima facie* case of discrimination in recreational services.

## C. *Fire Services.*

The Rand Institute of New York City undertook a study of the District's fire services in early 1974. That study, unfortunately, is not yet finally completed. The Court has, however, received a copy of the preliminary findings of the study. Those preliminary findings indicate that neither the somewhat higher fire rate in Anacostia nor the higher workload there would necessitate the assignment of additional companies there.[40] The study noted that the average response distance of both the first and second engines was about the same in Anacostia and west of the Park.[41] The response distance for the first truck was less in Anacostia than west of the Park; but the response distance for the second truck was significantly greater in Anacostia than west

of the Park—apparently because of Anacostia's unusual geographic configuration,[42] and the layout of streets and avenues. Data on response time is not fully available. Assuming equal travel velocities in the two areas, response time for engines is approximately equal.[43] First truck response west of the Park is about eighteen seconds slower than in Anacostia while second truck response is about 96 seconds faster.[44] If velocities in Anacostia are less than west of the Park (and this is unclear), response time would be generally greater than west of the Park.[45] The significance of a difference in response time is not clear for most situations.[46] An earlier study performed by the District by the Westinghouse Management Services in 1971 concluded that one engine company should be moved to Anacostia.

■ From the materials before it, the Court concludes that again there has been no showing of substantial differences in the services provided to Anacostia as compared to the area west of the Park. Even if the Westinghouse study is fully accepted, the most that can be said is that one company should be added to Anacostia. In light of the many factors that go into a determination of the size, type and scope of the firefighting effort, even this conclusion would not be sufficient to show significant differences in the level of services accorded. It amounts to no more than a difference of view on a permissible scale. No discrimination has been shown.

---

38. *Id.* at 38.

39. The Court also thinks that it should not and cannot choose one index from the others as determinative.

40. A. Swersey, *An Analysis of the Distribution of Fire Protection in Washington, D.C.: Preliminary Findings* (New York City Rand Institute, August, 1974), at 10 [hereinafter cited as *"Fire"*]. Workload is not high in either area. *Id.* at 3.

41. *Fire* at 6.

42. *Id.*

43. *Id.* at 8.

44. *Id.*

45. *Id.* First engine response would then be estimated about 30 seconds faster west of the Park, second engine about 36 seconds faster, first truck eighteen seconds faster and second truck 126 seconds faster. It must be emphasized, however, that data on the travel velocities in the two areas is not complete and it is not known whether velocities are relatively higher in one area as compared to the other. Indeed, data available suggests that velocities both in Anacostia and west of the Park are less than those in other areas of the District. *See id.* at 7.

46. *Id.* at 9.

## D. *Sidewalks.*

Plaintiffs claim that there is a need for the construction of as much as 15 miles of sidewalks in Anacostia, especially in areas adjacent to apartment dwellings. It is said, moreover, that there is no comparable need in the area west of the Park.[47] It is undisputed that the District's traditional policy has been to construct sidewalks only in response to a petition from an adjacent landowner (who must bear 50 percent of the cost of such construction) despite the fact that it was permitted by law to construct sidewalks where a need for such was discerned.[48] It is also undisputed that the policy above mentioned was abandoned in 1970.[49] The District has, since 1970, followed a policy of giving consideration to the building of sidewalks "on the basis of requests from citizen and civic associations, PTA's, and individual citizens, and also when pedestrian counts and other factors indicate a need."[50] Plaintiffs themselves point out that about one-third of the monies budgeted for sidewalk construction in the city has been earmarked for use in reducing the "sidewalk backlog" in Anacostia (mostly in the far Southeast).[51]

The Court has grave doubts about plaintiffs' standing on this issue in light of *Warth v. Seldin.*[52] It is not disputed that only one plaintiff (Mr. Gibson) has ever petitioned for construction of a sidewalk and that his petition has been withdrawn. It is also undisputed that (except for Mr. Gibson) all plaintiffs now live and have lived in residences which are and were adjacent to sidewalks. It is extremely difficult, then, for the Court to discern the sort of actual *personal* injury or harm which *Warth* so clearly says is necessary.

 Even assuming that standing exists, however, the Court is not satisfied that plaintiffs have here shown a case of discrimination. The policy of which they complain no longer exists. Sidewalks may now be built where a need for them is discerned and that need may be brought to the attention of the District in a variety of ways. The District now devotes a very large share of its sidewalk construction funds to the building of sidewalks in Anacostia. Discrimination, if any there was,[53] clearly no longer exists, and the purported effects of past discrimination are being rectified by a major commitment of resources. The Court sees no necessity for its intervention.

47. Plaintiffs assert that there is a need for the construction of no more than one mile of sidewalks in the area west of the Park. *See Plaintiffs' Supplemental Memorandum* dated Oct. 25, 1974. The sidewalk situation is better west of the Park at least partly because that area is of greater antiquity as a residential area. *Memorandum of Plaintiffs in Opposition to Defendants' Motion for Summary Judgment* at 30. Thus, about 50 percent of all housing units west of the Park were built before 1940 while only 11 percent of them were built during the period 1960–70. *Id.* As plaintiffs state, the situation is such that "most sidewalk needs there have long since been taken care of." *Id.* By contrast, only 17.6 percent of the housing units in Anacostia were built before 1940. *Id.* at 12. Over 25 percent of the housing units in Anacostia were built in 1960–70 period. *Id.* Anacostia's population grew by 18 percent between 1960 and 1970 while that of the District generally shrank one percent in the same time. *Id.* The picture presented is of one area that has expanded rapidly and greatly since World War II while the other area has remained relatively static. In short, the need for sidewalks in Anacostia is of relatively recent vintage.

48. D.C.Code Ann. § 7–608 (1973).

49. *Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment* at 31.

50. *Affidavit of H. James Spelman, Jr.* at ¶4.

51. By fiscal 1974, the District had some $438,000 appropriated for such construction. *Second Affidavit of H. James Spelman, Jr.* at 3. It costs about $100,000 per linear mile to build a sidewalk. *Id.*

52. 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It is worth noting that the allegations here, as in *Warth*, were vague and conclusory and that plaintiffs themselves have not sought to petition for change. *See id.* at 516, 95 S.Ct. 2197.

53. The Court by no means thinks that a case of past discrimination has been established. All that is clear is that the District's old policy

### E. *Refuse Collection.*

The Court turns now to the question of refuse collection. The basis of the complaint in this area is the fact that refuse collection in the District is accomplished by use of three separate systems. The National Capital Housing Authority is responsible for collection of refuse from public housing projects.[54] The District itself is responsible for collection of waste from all residences having three or fewer dwelling units. Responsibility for waste collection from private residences having four or more dwelling units rests with the landlord thereof, who contracts with private disposal firms to perform the task. Plaintiffs insist that this distinction between residences with less than four dwelling units and residences with four or more units is an improper one. They urge that the District itself should provide refuse collection services to all units.[55]

 The Court is again troubled by the question of standing. It appears quite clear that plaintiff Gibson has no standing in this matter since he apparently owns his own house.[56] He therefore receives full services from the District. Plaintiff Jones lives in a National Capital Housing Authority house (scattered site housing).[57] It does not appear whether NCHA is responsible for refuse collection at the Jones home.[58] If NCHA is so responsible, Jones has no standing as against the District. If, however, the District is responsible for waste collection from Jones' residence,

she—like Gibson—could not show personal harm since the dwelling is apparently a single-family residence. Plaintiff Cloyd lives in an NCHA project[59] and thus lacks standing to sue the District. Plaintiffs Daniels, Burner, and Patterson live in housing which is federally assisted; but it is not clear whether these are NCHA projects.[60] Plaintiff Thomas appears to live in an apartment building which is not federally assisted.[61] She alone would certainly be subject to the distinction drawn between buildings with four or more dwelling units and those with three or less.

 Turning to the merits, the Court thinks that plantiffs have completely failed to show a significant difference in level of services accorded to the various areas of the city. Indeed, their complaint resolves itself essentially into a claim that the District has erred in its belief that it must not collect certain types of waste from residences having four or more dwelling units and that this erroneous belief discriminates against the residents of Anacostia.

The distinction in question first arose in 1919 when the Congress appropriated money for the District to expend in collecting "garbage, dead animals, night soil, and miscellaneous refuse and ashes"[62] but provided that the appropriation could not be used for collecting "ashes and miscellaneous refuse from large apartment and boarding houses."[63] By 1961, the limiting language had grown more refined and provided that

---

applied to all persons and to all areas for a long time. Thus, far from there existing a link with discriminatory practices of the past, it would seem that the old policy was applicable to times and areas when racial minorities were not significantly present here.

54. Since 1970, however, NCHA has contracted for provision of waste collection services.

55. ·Part and parcel of this claim is the argument that the private contractors are inadequately supervised by the District. Hence, say plaintiffs, they do a less than acceptable job.

56. *See* Answers of Plaintiff Charles Gibson to Interrogatories of Federal Defendants (filed

April 24, 1972) [hereinafter cited as Answers of Plaintiff _____].

57. Answers of Plaintiff Jones.

58. NCHA is responsible for waste collection in its housing projects, but responsibility for scattered site housing is unclear.

59. Answers of Plaintiff Cloyd.

60. Answers of Plaintiffs Daniels, Burner and Patterson.

61. Answers of Plaintiff Thomas. The 1973 City Directory for Washington, D. C., shows the address given by Thomas to be that of an apartment building.

62. Act of Aug. 31, 1918, 40 Stat. 918, 929–30.

63. *Id.* at 930.

the appropriation was not to be used to collect ashes or miscellaneous refuse from apartments containing four or more dwelling units.[64] That limitation has been carried forward to the present. It is undisputed that the District has, from the start, interpreted these provisions to prohibit collection of any refuse whatsoever from large apartment houses and the like. Plaintiffs argue that this interpretation is plainly in conflict with the language of the statute. They urge that the District has the power to collect at least certain types of refuse from the larger dwelling. Power being father to duty, plaintiffs further urge that the District *must* collect certain refuse regardless of the size of the dwelling.

Whatever might be said for plaintiffs' views if the Court were writing on a clean slate, they are not persuasive in the present circumstances. The administrative interpretation in question has existed for over 50 years. Such a longstanding administrative interpretation is entitled to great respect, especially where Congress has given no indication of dissatisfaction with that interpretation in subsequent amendments or other actions.[65] The Court recognizes, of course, that Congressional silence or inaction during amendment—or even re-enactment—of an Act does not necessarily signify legislative consent to an administrative interpretation of a statute.[66] Here, however, we deal with

an appropriations act. Appropriations for the District are freshly considered and voted annually. Since 1919 each such appropriations Act has contained language substantially similar to that at issue here. For that same period of over 50 years, the administrative interpretation by the District of the subject language has been consistently as described above. The Court thinks that Congress must necessarily be deemed to have had knowledge of that interpretation. The case, therefore, would seem to be squarely within the rule of *Kay v. Federal Communications Commission*[67] where it was said that:

> [A] consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of Congress and not changed by it, is almost conclusive evidence that the interpretation has congressional approval.[68]

The Court cannot but conclude that the District's interpretation of the questioned statute has been adopted and approved by Congress.[69]

### F. *Common Law and Statutory Rights.*

The analysis so far presented has failed to reveal any discrimination in the services at issue here. That same analysis applies with equal force to the asserted common law and statutory grounds for relief.

---

64. Pub.L. 86–412, 74 Stat. 17, 24. As enacted, Public Law 86–412 prohibited collection of ashes and miscellaneous refuse from "apartment houses of four or more apartments having a central heating system . . . ." *Id.* The central heating system limitation has since been dropped. *See* Pub.L. 93–91, § 10, 87 Stat. 306, 310 (1973).

65. *Chemehuevi Tribe of Indians v. Federal Power Commission*, 420 U.S. 395, 409–410, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975) ; *Saxbe v. Bustos*, 419 U.S. 65, 73–74, 95 S.Ct. 272, 42 L.Ed.2d 231 (1974) ; *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ; *see Kay v. Federal Communications Commission*, 143 U.S.App. D.C. 223, 231–32, 443 F.2d 638, 646–47 (1970).

66. *See March v. United States*, 165 U.S. App.D.C. 267, 506 F.2d 1306, 1315 n. 37 (1974.)

67. 143 U.S.App.D.C. 223, 443 F.2d 638 (1970).

68. *Id.*, 143 U.S.App.D.C. at 231–32, 443 F. 2d at 646–47.

69. Plaintiffs also contend that the District's interpretation has undue impact on persons in Anacostia. This is based on their assertion that more affluent apartment dwellers west of the Park apparently enjoy the services of more efficient private refuse services than do less affluent persons in Anacostia. This they attribute to the fact that those west of the Park have the economic "clout" to force higher standards upon the private trash services. In this the Court detects no governmental action connected with discrimination.

**54**

## CONCLUSION

Inasmuch as plaintiffs have failed to show any discrimination in the provision of the municipal services at issue here, their claims against the District defendants will be dismissed.

## ORDER

Upon consideration of the cross-motions for summary judgment herein, and for the reasons set forth in the Court's memorandum-opinion attached hereto, it is by the Court this 14th day of July, 1975,

Ordered that plaintiffs' motion for summary judgment as to the District of Columbia defendants be, and it is, denied; and it is further

Ordered that the motion for summary judgment filed on behalf of the District of Columbia defendants be, and it is, granted; and it is further

Ordered that judgment of dismissal be, and it is, granted as to all District of Columbia defendants.